**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

SALWA ALSONIDAR, *et al.*,

                Plaintiffs,

        -v-                          1:24-CV-963 (AJB/DJS)

KRISTI NOEM, *et al.*,

                Defendants.

_____

**Hon. Anthony Brindisi, U.S. District Judge:**

<u>**DECISION and ORDER**</u>

## I.      INTRODUCTION

Salwa Ahmed Alsonidar ("Salwa"), Erjuwan Luft Ali Alsonidar ("Erjuwan"), Noor Luft Ali Alsonidar ("Noor"), and M.L.A.A., a minor child (collectively, "plaintiffs"), have filed this action alleging that various federal government officials and agencies unlawfully denied petitions for immigration visas that Salwa filed on behalf of Erjuwan, Noor, and M.L.A.A.

More specifically, plaintiffs, who are Yemeni nationals, allege that the Secretary of the Department of Homeland Security ("DHS"), the Director of the United States Citizenship and Immigration Services ("USCIS"), the Director of USCIS's Albany Field Office, USCIS itself, and the Board of Immigration Appeals ("BIA") (collectively, "defendants")[1] violated the

---

[1] Former DHS Secretary Alejandro Mayorkas and former USCIS Director Ur Jaddou were originally among the named defendants.  Dkt. No. 1 at 1.  Since filing, Kristi Noem has succeeded Mayorkas as DHS Secretary and Jennifer B. Higgins has succeeded Jaddou as Acting USCIS Director.  *See* Dkt. No. 19 at 2.  Accordingly, pursuant to Federal Rule of Civil Procedure 25(d), the Court will order Noem and Higgins substituted as defendants.

Administrative Procedure Act ("APA"), the Fifth Amendment, and the Religious Freedom Restoration Act ("RFRA") by denying the petitions due to anti-Yemeni and/or anti-Muslim bias.

Defendants have moved under Federal Rule of Civil Procedure ("Rule") 12(b)(6) to dismiss the complaint, asserting that plaintiffs have failed to state a claim for which the Court can grant relief. Plaintiffs opposed, and defendants served a reply. While the motion was pending, this case was reassigned from U.S. District Judge David N. Hurd to this Court.

Having been fully briefed, defendants' motion will be GRANTED based on the parties' submissions without oral argument.

## II.    BACKGROUND

The following allegations are drawn from the complaint, Dkt. No. 1 ("Compl."), and are assumed to be true for the purpose of resolving defendants' motion to dismiss.

Originally from Yemen, Salwa is a lawful permanent resident of the United States currently residing in Schenectady, New York. Compl. ¶ 20. She and her husband, Luft Ali Mohammed Alsonidar ("Luft"), have two biological children, Erjuwan and Noor, and one adoptive child, M.L.A.A. *Id.* ¶¶ 22–25. Noor was born in 1998. *Id.* ¶ 24. Erjuwan was born in 2005. *Id.* ¶ 23. M.L.A.A. was born in 2011 and became an orphan shortly thereafter. *Id.* ¶¶ 25–26. Salwa and Luft adopted M.L.A.A. on October 20, 2011. *Id.* ¶ 26. All three children are citizens of Yemen. *Id.* ¶¶ 12–14.

Salwa became a lawful permanent resident of the United States on July 7, 2016. Compl. ¶ 21. On December 23, 2016, she filed Form I-130 petitions on behalf of Erjuwan, Noor, and M.L.A.A., which, if granted, would have allowed them to come to the United States, too. *See id.* ¶ 27. USCIS reviewed the petitions and, on November 19, 2018, requested additional evidence

that Erjuwan, Noor, and M.L.A.A. were Salwa's children.  *Id.* ¶ 29.  Salwa provided more information on January 14, 2019, *id.* ¶ 30, and she sat for an interview about the three petitions on January 7, 2021, *id.* ¶ 31.  During the interview, she explained that Erjuwan and Noor were her biological children and M.L.A.A. was her adoptive daughter.  *Id.*  But she declined to provide DNA evidence.  *Id.*

USCIS denied all three petitions on February 16, 2022.  Compl. ¶ 32.  In doing so, the agency cited the evidence that Salwa had provided to prove the claimed relationships, including a family booklet and school records.  *See id.* ¶¶ 33, 35.  The agency noted that "[t]he family ID booklet was issued in 1991, however four of [Salwa's] children were listed as being born after 1991," which "call[ed] into question the legitimacy of the document."  *Id.* ¶ 33.  It noted that the school records omitted the children's dates of attendance and/or parents' names, so they "did not assist in establishing a claimed familial relationship and were given no weight."  *Id.* ¶ 35.  And it noted that Salwa did not submit DNA evidence.  *Id.* ¶ 37.

USCIS also specifically rejected the materials offered to prove that Salwa and Luft had adopted M.L.A.A.  Compl. ¶ 41.  Observing that Yemeni law does not provide for the adoption of Yemeni children in Yemen, the agency stated its general requirement that those "considering adoption of a Yemeni child must obtain guardianship for emigration and adoption in the United States from the Yemen court that has jurisdiction over the prospective adoptive child's place of residence."  *Id.*  Salwa had not done so.

But these evidentiary issues were not all: plaintiffs' exhibits highlight that USCIS identified a multitude of other specific problems with the materials Salwa submitted, all of which contributed to the denials of the visas.  *See* Ex. I to Compl., Dkt. No. 1-1 at 28–30; Ex. O to Compl., Dkt. No. 1-1 at 48–49; Ex. U to Compl., Dkt. No. 1-1 at 67–68.

Beginning with M.L.A.A.'s denial letter, USCIS stated the applicable standard of review as follows: "[t]o demonstrate that an individual is eligible for approval as the beneficiary of a petition filed under INA 203(a), a petitioner must: [e]stablish a bona fide parent-child relationship with the beneficiary; and [e]stablish that . . . she is a . . . lawful permanent resident (LPR)." Ex. I to Compl., Dkt. No. 1-1 at 28. It further explained that Salwa bore the burden of establishing eligibility, citing *Matter of Brantigan*, 11 I&N Dec. 493, 495 (BIA 1966) and 8 C.F.R. § 103.2(b). *Id.*

The letter noted that the denial followed "a thorough review of [M.L.A.A.'s] petition, the testimony provided during [Salwa's] interview, and the record of evidence." *Id.* And it outlined the process preceding the denial, including Salwa's filing of the petition on December 23, 2016; USCIS's issuance of a request for evidence, "advising [Salwa] that the evidence supporting the petition was insufficient" on November 19, 2018; Salwa's providing new materials on January 14, 2019; her sworn interview on January 7, 2021; and her submission of "additional, unsolicited evidence" on August 9, 2021. *Id.* at 28–29.

In addition to listing the various materials from Salwa that USCIS considered, the letter explicitly stated the agency's reasons for denying M.L.A.A.'s petition. Ex. I to Compl., Dkt. No. 1-1 at 28–29. Alongside the suspect family booklet and the failure to provide any proof of guardianship "for emigration and adoption in the United States," these reasons included Salwa's submission of affidavits by her sister and mother indicating that "they were present and witnessed [Salwa] give birth to [M.L.A.A.]," even though Salwa had claimed to have adopted her, as well as a birth certificate that listed Salwa and Luft as M.L.A.A.'s parents, but which was dated before M.L.A.A. was born. *Id.* at 29–30.

Other evidence pertaining to M.L.A.A.'s petition apparently did not dispel USCIS's concerns. For example, the agency noted that Salwa had also offered a "[c]opy of an unidentified man's passport with no translations or explanations," and an unsolicited document "clarifying how to interpret guardianship laws under Yemeni legislation" that was missing a page, neither of which overcame the other materials' obvious credibility issues or proved the claimed relationship. *See* Ex. I to Compl., Dkt. No. 1-1 at 29–30.

In dismissing Salwa's appeal of M.L.A.A.'s denial, BIA likewise cited the non-contemporaneous birth certificate, the "family identification booklet that was determined to be false," and Salwa's failure to submit any other materials that could have reliably established the claimed familial relationship. *See* Ex. K to Compl., Dkt. No. 1-1 at 36–37.

Erjuwan's denial letter followed suit. There, USCIS informed Salwa that it had rejected Erjuwan's I-130 petition for similar reasons as M.L.A.A.'s. Ex. O to Compl., Dkt. No. 1-1 at 48–49. It noted that the denial followed "a thorough review of [Erjuwan's] petition, the testimony provided during [Salwa's] interview, and the record evidence." *Id.* at 48. It detailed the same timeline and information-gathering process described above. *See id.* at 48–49. And it similarly explained that USCIS denied Erjuwan's petition in part because Salwa had submitted false affidavits, a non-contemporaneous family booklet, and vague school records. *Id.* at 49.

BIA likewise dismissed Salwa's appeal of Erjuwan's denial for largely the same reasons as M.L.A.A.'s. *See* Ex. Q to Compl., Dkt. No. 1-1 at 55–56 (citing the later-issued birth certificate, the false family identification booklet, and the lack of any "sufficient secondary evidence").

Unsurprisingly, the agencies' responses to Noor's petition echoed their responses to M.L.A.A.'s and Erjuwan's. Ex. U to Compl., Dkt. No. 1-1 at 67. Like the others, USCIS noted that Noor's denial followed a "thorough review of [Noor's] petition, the testimony provided during [Salwa's] interview, and the record of evidence." *Id.* And once again, USCIS attributed the denial in part to the false affidavits, the family booklet, and the school records. *See id.* at 68.

Despite these evidentiary deficiencies (which plaintiffs do not meaningfully dispute), plaintiffs allege that defendants lacked a reasonable basis to deny the petitions. *See* Compl. ¶¶ 47–48. Instead, plaintiffs claim, USCIS broadly "den[ies] Yemeni adoptions on the basis that [S]haria law does not recognize adoptions in the [W]estern sense of the word," and in so doing impermissibly discriminates against Yemenis and Muslims. *See id.* ¶¶ 42–43. Plaintiffs further allege that defendants' rejection of Yemeni adoption procedures on their own terms misconstrues Sharia law and "impos[es] a [W]estern viewpoint on the legal concept of adoption." *Id.* ¶ 46.

Plaintiffs claim the denials were part of a "scheme to stymy and deny Yemeni visa applications" and "negat[e] Islamic practices." Compl. ¶ 48. To advance this "scheme," plaintiffs assert that defendants "have adopted various formal and informal adjudicatory and investigative policies and procedures which create and implement separate and distinct adjudication procedures for Yemeni-Americans designed to deter, delay, stymie and otherwise prevent Yemeni-Americans from sponsoring their children for immigrant visa applications . . . ." *Id.* ¶ 54. Such policies and procedures allegedly "reflect [d]efendants' predetermined intent to exile [p]laintiffs' family from the United States through administrative fiat." *Id.* ¶ 61. Thus, plaintiffs say, Yemeni visa applicants face "routine delays" and a "heightened standard . . . which considers all Yemeni petitions to be 'fraudulent until proven otherwise.'" *Id.* ¶ 62.

Plaintiffs further take issue with USCIS Policy Memorandum PM-602-0064 (the "Policy"), upon which the agency historically relied when evaluating visa petitions. *See* Compl. ¶¶ 73–85. According to plaintiffs, among other things, the Policy improperly obligates USCIS staff to seek additional proof of Yemenis' relationships beyond routine records checks, to notify Yemeni applicants of USCIS's intent to deny I-130 petitions as a matter of course, to require in-person interviews for Yemenis, and to subject Yemenis' petitions to an unusually high degree of scrutiny. *Id.* But, despite all this, plaintiffs do not clearly state how these purported issues affected M.L.A.A.'s, Noor's, and/or Erjuwan's petitions, specifically.

Rather, plaintiffs concede that USCIS abandoned the Policy before denying M.L.A.A.'s, Erjuwan's, and Noor's petitions in February 2022. *See, e.g.*, Compl. ¶ 112 (referencing "publicly adopted agency policies rescinding the Yemeni adjudication policies"); Ex. LL to Compl., Dkt. No. 1-1 at 359 (referring to "a November 23, 2021 amendment to USCIS's Policy Manual that rescinded and replaced the agency's prior guidelines for adjudicating family-based I-130 petitions that were supported by relationship documents issued by a civil authority in Yemen"); Ex. NN to Compl., *id.* at 380 ("(B) Petitions on Behalf of Aliens from Yemen. Chapter 21.2(c)(6)(B) . . . has been superseded . . . as of November 23, 2021.").

Still, plaintiffs claim that "[d]efendants conspired to promulgate and effectuate the unlawful and discriminatory Yemeni I-130 adjudicative standards and applied the unlawful program to [Salwa's] I-130 [p]etitions." Compl. ¶ 88. And to the extent that Erjuwan, Noor, and M.L.A.A. cannot come to the United States, plaintiffs allege that they will continue to experience "severe emotional, financial, and physical hardship as well as family separation." *Id.* ¶ 103.

Thus, on August 5, 2024, plaintiffs filed a complaint asserting violations of the APA, the Fifth Amendment, and RFRA. Compl. Plaintiffs also seek declaratory relief. *Id.*

On December 6, 2024, defendants moved to dismiss all counts under Rule 12(b)(6), arguing plaintiffs have failed to state a claim for which the Court can grant relief.  Dkt. No. 13 at 7.  The case was reassigned to this Court on December 19, 2024.  Dkt. No. 15.  Plaintiffs opposed defendants' motion to dismiss on January 17, 2025, Dkt. No. 17, and defendants filed a reply on January 30, 2025, Dkt. No. 19.

### III.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, the complaint's factual allegations must elevate the plaintiff's right to relief above the speculative level.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  While legal conclusions can provide a framework for the complaint, they must be supported by meaningful factual allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  In short, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

To assess the plausibility requirement, the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the non-movant's favor.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  In doing so, the Court generally confines itself to allegations in the pleading, any documents attached to the complaint or incorporated to it by reference, and matters of which judicial notice may be taken.  *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)).

### IV.    DISCUSSION

Plaintiffs assert three substantive claims, violations of the APA ("Count One"), the Fifth Amendment ("Count Two"), and RFRA ("Count Three"), and separately seek relief under the Declaratory Judgment Act.  Compl. ¶¶ 107–171.

Defendants have moved under Rule 12(b)(6) to dismiss all counts for failure to state a claim. Dkt. No. 13. Among other things, as to Count One, defendants maintain that their handling of the petitions was entirely permissible, in part because they evaluated the relevant evidence, found it wanting, and explained the bases for the denials. *Id.* at 13–16. As to Count Two, defendants argue that the allegations concerning Yemeni petitions in general do not state an equal protection claim with respect to the individual petitions at issue here, and that plaintiffs have also failed to state purposeful discrimination. *Id.* at 18–20. And as to Count Three, defendants contend that plaintiffs have not stated a substantial burden on their exercise of religion, so they cannot plausibly allege a RFRA violation. *Id.* at 21–22.

For the reasons outlined below, the Court agrees that plaintiffs' claims must be dismissed.

## A.    Plaintiffs Have Not Plausibly Alleged an APA Violation

The APA provides that reviewing courts "shall hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

As relevant to this case, an "arbitrary and capricious" agency decision is one where

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983); *see also FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) ("A court [reviewing agency action] simply ensures that the agency has acted within a zone of

reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision.").

"When a party challenges agency action under the APA, the district court acts as an 'appellate tribunal' and the case on review presents 'a question of law.'" *Saleh v. Blinken*, 596 F. Supp. 3d 405, 413 (E.D.N.Y. 2022) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)). "Generally, a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision." *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997).

"The record must show that 'the agency . . . examine[d] the relevant data and articulate[d] a satisfactory explanation for its action.'" *Nat. Res. Def. Council v. EPA*, 658 F.3d 200, 215 (2d Cir. 2011) (quoting *State Farm*, 463 U.S. at 43). "Moreover, the agency's decision must reveal a 'rational connection between the facts found and the choice made.'" *Id.* "In other words, so long as the agency examine[d] the relevant data and [ ] set out a satisfactory explanation including a rational connection between the facts found and the choice made, a reviewing court will uphold the agency action . . . ." *Karpova v. Snow*, 497 F.3d 262, 268 (2d Cir. 2007).

Thus, "the ultimate standard of review is a narrow one," and the reviewing court must not "substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

As to the agency actions in question here, the I-130 visa application process is governed in part by 8 C.F.R. § 103.2. Section 103.2(b) provides that a "petitioner must establish that . . . she is eligible for the requested benefit at the time of filing," and that each petition "must be properly completed and filed with all initial evidence required by applicable regulations and

other USCIS instructions."  8 C.F.R. § 103.2(b).  That section also specifies that "[t]he non-existence or other unavailability of required evidence creates a presumption of ineligibility."  *Id.*

When required evidence "does not exist or cannot be obtained," a petitioner must instead "submit secondary evidence, such as church or school records, pertinent to the facts at issue."  8 C.F.R. § 103.2(b)(2)(i).  And when such secondary evidence is unavailable, a petitioner must submit "two or more affidavits, sworn to or affirmed by persons who are not parties to the petition who have direct personal knowledge of the event and circumstances."  *Id.*  Accordingly, "[s]econdary evidence must overcome the unavailability of primary evidence, and affidavits must overcome the unavailability of both primary and secondary evidence."  *Id.*

The USCIS Policy Manual offers additional guidance as to the difference between primary and secondary evidence.  It provides that "[p]rimary evidence is evidence that on its own proves an eligibility requirement," whereas "[s]econdary evidence . . . may demonstrate a fact is more likely than not true, but . . . does not derive from a primary, authoritative source."  U.S. Citizenship and Immigr. Servs., Policy Manual, Vol. 1: General Policies and Procedures, Ch. 6: Evidence (2025), https://www.uscis.gov/policy-manual/volume-1-part-e-chapter-6.

USCIS has broad discretion when evaluating evidence submitted in connection with visa petitions.  As § 204.1 explains, documentary evidence "must be in the form of primary evidence, if available."  8 C.F.R. § 204.1(f)(1).  To determine when primary evidence is available, USCIS looks to the State Department's Foreign Affairs Manual.  *Id.*  Importantly, however, "[t]he determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of [USCIS]."  *Id.*

Turning to the allegations in this case, the crux of Count One is that the APA provides an avenue for relief from "[d]efendants' failure to follow the procedures explicitly set forth in the USCIS Policy Manual, official agency policy memoranda, and publicly adopted agency policies rescinding the Yemeni adjudication policies." Compl. ¶ 112. According to plaintiffs, defendants violated these policies by improperly "disregard[ing] all family evidence that established the relationship[s]" and "misappl[ying] the governing legal standards and standards for burdens of proof." *Id.* ¶¶ 114–115.

But these conclusory statements misconstrue the facts alleged. Given the wide latitude afforded to agency action under the governing regulations, as well as plaintiffs' own allegations and the documents appended to the complaint, the denials of M.L.A.A.'s, Erjuwan's, and Noor's petitions fail to show that defendants violated the APA. USCIS's denial letters confirm that the agency "examine[d] the relevant data and [ ] set out a satisfactory explanation" for rejecting the I-130 petitions that "includ[ed] a rational connection between" its factual findings and the denials, and that BIA followed suit. *See Karpova*, 497 F.3d at 268.

The Court will examine each petition in turn. First, as to M.L.A.A.'s denial and failed appeal, USCIS informed Salwa of its decision in a letter dated February 16, 2022. Ex. I to Compl., Dkt. No. 1-1 at 28. As detailed above, the letter correctly restated the applicable legal standard, explaining that Salwa had to establish M.L.A.A.'s eligibility and citing the applicable regulation and BIA precedent. *Id.* It noted that the denial followed "a thorough review of [Salwa's] petition, the testimony provided during [her] interview, and the record of evidence." *Id.* And it detailed the application process, the materials Salwa submitted, and those materials' various shortcomings. *Id.* at 28–29.

Those shortcomings included, but were not limited to, the fact that an affidavit from Salwa's family members attested that they had seen her give birth to M.L.A.A., even though Salwa has consistently claimed M.L.A.A. was her adoptive—not biological—daughter.  *See* Ex. I to Compl., Dkt. No. 1-1 at 29–30.  It would have been entirely appropriate for USCIS to find that Salwa's submission of a false sworn document by itself fatally undermined the credibility of the rest of the materials she submitted on behalf of M.L.A.A., Erjuwan, and Noor.

Plaintiffs' exhibits bring them no closer to plausibly alleging that defendants violated the APA.  One, for example, is a collection of more than 150 photographs of individuals and landscapes, some labeled, some unlabeled, and all undated.  Ex. Y to Compl., Dkt. No. 1-1 at 80–242.  Another contains dozens of images of receipts and screenshots of emails about money transfers.  Ex. Z to Compl., Dkt. No. 1-1 at 244–95.  One more, entitled "Realizing Children's Rights in Yemen," appears to be drawn from a public website that does not concern the three individual petitions at issue in this case.  Ex. II to Compl., Dkt. No. 1-1 at 342–47.  And still others are either informally translated or completely untranslated.  *See, e.g.*, Exs. AA & GG to Compl., Dkt. No. 1-1 at 297–304 & 333–38.

So, even setting aside the false affidavit for the sake of argument, to the extent that plaintiffs suggest that the additional submissions should have changed USCIS's conclusions, the Court is unconvinced.  As described above, Salwa submitted as proof of the claimed relationship a family booklet and a birth certificate that were both issued before M.L.A.A. was born; unhelpful school registration records; and a variety of photographs, untranslated materials, and third-party assessments of Yemeni adoption procedures.  *See* Ex. I to Compl., Dkt. No. 1-1 at 29–30.  Due consideration of any or all of the foregoing would lead to the same outcome: that Salwa failed to establish the claimed relationship.

Ultimately, having assessed Salwa's materials, USCIS found that she had not carried her burden, denied M.L.A.A.'s petition, and explained why it did so.  Ex. I to Compl., Dkt. No. 1-1 at 28–30.  Nothing plaintiffs have offered suggests that any part of the procedure USCIS followed as to M.L.A.A.'s petition, or the outcome it ultimately reached, was improper.

BIA likewise acted permissibly in dismissing the appeal of M.L.A.A.'s denial.  Like USCIS, BIA evaluated the materials before it, reached a reasonable conclusion, and articulated its rationale.  According to plaintiffs' exhibits, BIA specifically noted that "a late registered birth certificate is not generally conclusive evidence," and that the other materials Salwa submitted did little to advance her claims and establish the claimed relationship, given the materials' credibility issues that USCIS articulated in detail.  *See* Ex. K to Compl., Dkt. No. 1-1 at 36–37.  As such, the Court will not reverse the denial of M.L.A.A.'s petition.

Second, the Court likewise finds no grounds to disturb the denial and failed appeal of Erjuwan's petition.  As expressed in its denial letter, USCIS followed a lengthy process to collect and evaluate evidence regarding the claimed relationship between Salwa and Erjuwan.  Ex. O to Compl., Dkt. No. 1-1 at 48–49.  USCIS explained that it denied Erjuwan's petition in part because Salwa had submitted the false affidavit and insufficient secondary materials, as described above.  *Id.*  And in dismissing the appeal of Erjuwan's denial, BIA appropriately explained its decision-making process, again citing the later-issued birth certificate, the false family identification booklet, and the lack of any "sufficient secondary evidence."  *See* Ex. Q to Compl., Dkt. No. 1-1 at 55–56.

Third and finally, Noor's denial and failed appeal must remain in effect for essentially the same reasons.  In the third letter from February 16, 2022, USCIS explained that it denied Noor's petition after collecting and evaluating substantially the same materials or kinds of materials that

Salwa had submitted in connection with the other petitions. *See* Ex. U to Compl., Dkt. No. 1-1 at 67. Like the others, Noor's denial was based in part on the false affidavits from Salwa's mother and sister, the non-contemporaneous family booklet, and the vague school records. *See id.* at 68. These were each reasonable bases upon which to deny all three petitions.

Indeed, this case bears a striking similarity to *Almakalani v. McAleenan*, 527 F. Supp. 3d 205 (E.D.N.Y. 2021), where the trial court rejected an APA challenge to USCIS's denial of dozens of Yemenis' I-130 visa petitions. Although that case weighed a motion for summary judgment, and the specific guidance in question, *i.e.*, the Policy, has changed, its outcome echoes here. *See* 527 F. Supp. 3d at 220. The *Almakalani* court noted, for example, that

> the stated objective and function of the Yemen Guidance is . . . to establish and standardize the means by which petitioners may rebut the presumption of ineligibility . . . that arises . . . from the regulations providing that applications without primary evidence are presumptively ineligible and the State Department guidance that Yemeni court judgments do not constitute primary evidence.

*Id.* Considering the agency's concern for the accuracy and credibility of documents submitted in support of visa applications, these procedures were "neither arbitrary nor an abuse of discretion." *Id.* So, too, here.

In this case, plaintiffs have not plausibly alleged that defendants exceeded their authority. Quite the opposite: the complaint and exhibits show that in assessing M.L.A.A.'s, Erjuwan's, and Noor's I-130 petitions, USCIS evaluated the evidence presented, reached eminently reasonable conclusions, and explained its reasoning, and BIA did the same on appeal. Given the narrow scope of judicial review under the APA, the Court can find no basis on which to disturb those conclusions.

Accordingly, defendants' motion to dismiss Count One must be granted.

### B.    Plaintiffs Have Not Plausibly Alleged an Equal Protection Violation

Next, in Count Two, plaintiffs assert that defendants violated the Fifth Amendment by discriminating against them based on their national origin, by singling out Yemenis for heightened evidentiary requirements and visa-processing delays.  *See* Compl. ¶¶ 130–132.  But their conclusory allegations as to this claim are equally unavailing.

"The Supreme Court's approach to Fifth Amendment equal protection claims is 'precisely the same as to equal protection claims under the Fourteenth Amendment.'"  *Almakalani*, 527 F. Supp. 3d at 229 (quoting *Sessions v. Morales-Santana*, 582 U.S. 47, 52 n.1 (2017)).  Thus, an adequately pleaded claim will plausibly allege at least one of the following: "(1) that a law or policy is discriminatory on its face; (2) that a facially neutral law or policy has been applied in an intentionally discriminatory manner; or (3) that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus."  *Alharbi v. Miller*, 368 F. Supp. 3d 527, 563 (E.D.N.Y. 2019).  Yet plaintiffs offer no plausible, non-conclusory claims in this count.

The precise nature of plaintiffs' Fifth Amendment allegations are somewhat unclear.  As an initial matter, plaintiffs contend that "Defendants' discriminatory Yemeni adjudication standards and procedures . . . [are] on [their] face discriminatory and in violation of Plaintiffs' constitutional rights," suggesting a facial challenge.  Compl. ¶ 3.  Elsewhere, plaintiffs gesture toward a discriminatory purpose and/or animus.  *See, e.g.*, *id.* ¶¶ 42–43 (claiming that "deny[ing] Yemeni adoptions on the basis that sharia law does not recognize adoptions in the western sense of the word . . . is discriminatory against the formation of legitimate family relationships in Muslim countries, and the Islamic faith"); 48 (referring to a "discriminatory purpose of negating Islamic practices"); 60 (asserting an "objective to reduce, delay, stymie, and prevent Yemeni-American citizens from building lasting generational permanence in the fabric of our society");

81 (alleging the imposition of "unfair and discriminatory standards and practices on the account of [plaintiffs'] Arab race, Islamic faith, and/or Yemeni national origin").

Plaintiffs do little to expand upon these broad, conclusory assertions, rendering them inadequately pleaded.  For example, they claim that "[t]he various procedures, delays, and administrative failures adopted and performed by Defendants over the course of the adjudication of Plaintiffs' visa application" reveal a "predetermined intent to exile Plaintiffs' family from the United States through administrative fiat."  Compl. ¶ 61.  But the complaint does not identify the "procedures, delays, [or] administrative failures" that affected the processing of M.L.A.A.'s, Noor's, or Erjuwan's petitions in particular, nor do the pleading or other submissions supply any factual grounds upon which to plausibly infer that defendants harbored a "predetermined intent to exile" plaintiffs, or for that matter anyone else, from the United States.  Unfortunately, all that plaintiffs have offered the Court is a series of impassioned—but unsubstantiated—assertions.

Building on these observations, defendants have identified various additional shortcomings in Count Two.  They point out that this case is not a class action concerning all Yemeni visa applicants, but rather a suit about the named plaintiffs' I-130 denials; that plaintiffs do not claim that the alleged issues regarding the processing of Yemeni petitions writ large affected their discrete petitions; that plaintiffs concede that the complained-of policies regarding Yemeni petitions were rescinded before plaintiffs' denials; and that plaintiffs have attempted to plead an equal protection violation in terms that are too sweeping and conclusory to make out a plausible claim.  Dkt. No. 13 at 18.

Broadly speaking, the Court agrees.  As to plaintiffs' contention that the procedures used to evaluate visa applications—either Yemenis' generally, or theirs specifically—are facially impermissible, plaintiffs have conceded that the challenged policies changed by the time USCIS

denied M.L.A.A.'s, Noor's, and Erjuwan's petitions.  *See, e.g.*, Compl. ¶ 112.  In any case, plaintiffs have failed to plausibly allege an equal protection violation based on any facial discrimination.  Even at the pleading stage, merely claiming that the challenged policies were "on [their] face discriminatory," *id.* ¶ 3, is insufficient.  *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (citing *Twombly*, 550 U.S. at 555).  So, Count Two must fail as a facial challenge.

Plaintiffs also fail to plead intentional discrimination or animus.  Plaintiffs offer no non-conclusory allegations that any of the defendants took any actions "'because of, not merely in spite of, [their] adverse effects upon an identifiable group.'"  *Cf. Alharbi*, 368 F. Supp. 3d at 563 (quoting *Iqbal*, 556 U.S. at 676–77).  Rather, the complaint as a whole describes a process entailing neutral, detailed evidence gathering and evaluation procedures, which may—and, here, did—result in denials based on reasoned conclusions of insufficiency.  *See* Compl. ¶¶ 72–85.

Like Count One, *Almakalani* also proves instructive as to Count Two.  There, plaintiffs had argued that USCIS's manner of evaluating visa applications violated the Fifth Amendment's equal protection guarantee, including by subjecting Yemenis to "an unduly rigorous and lengthy adjudication process because of 'animus and impermissible discriminatory motives.'"  527 F. Supp. 3d at 229.  But the trial court rejected that argument, concluding that requiring evidence beyond Yemeni government records to prove asserted relationships did not flout the Fifth Amendment.  *Id.* at 220.  While the court noted that doing so indeed "impose[d] a heightened evidentiary burden on Yemeni beneficiaries and their family-member petitioners," it was not necessarily the case that such petitions were either "held to a different standard than *other petitions for which primary evidence is unavailable*," or that this "distinct evidentiary burden" created a higher burden of proof.  *Id.* (emphasis added).  And since USCIS is empowered to

evaluate credibility and request additional evidence when it determines that submissions are insufficient, these procedures are permissible.  *Id.* at 220–21.  Nothing about this case's factual or procedural contexts changes that analysis.

As such, plaintiffs have failed to state a Fifth Amendment violation, and Count Two must be dismissed.

### C.     Plaintiffs Have Not Plausibly Alleged a RFRA Violation

Finally, in Count Three, plaintiffs claim that defendants' actions violated their religious-freedom rights under RFRA.  But Count Three, too, is insufficiently pleaded.

RFRA provides that the "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person is in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that governmental interest."  42 U.S.C. § 2000bb-1(b).

To properly state a claim under RFRA, first, "plaintiffs must demonstrate that they sought to engage in the exercise of religion and that the defendant-officials substantially burdened that exercise."  *Sabir v. Williams*, 52 F.4th 51, 59 (2d Cir. 2022).  Then, once plaintiffs have done so, the burden shifts to defendants "to show 'that [they] lack[ ] other means of achieving [their] desired goal without imposing a substantial burden on the exercise of religion by the objecting parties.'"  *Id.* (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014)).

When evaluating RFRA's "substantial burden" requirement, the Court must determine "whether [plaintiffs'] engaging in [a] religious observance 'is considered central or important to [their] practice of [their] religion.'"  *Kravitz v. Purcell*, 87 F. 4th 111, 119–20 (2d Cir. 2023) (quoting *Ford v. McGinnis*, 352 F.3d 582, 593–94 (2d Cir. 2003)) (cleaned up).

"[A] substantial burden . . . exists when an individual is required to 'choose between following the precepts of her religion and forfeiting benefits . . . and abandoning one of the precepts of her religion.'" *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 348 (2d Cir. 2007) (quoting *Sherbert v. Verner*, 374 U.S. 398, 404 (1963)).  In other words, as a Second Circuit panel has observed, "a substantial burden exists where the state 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (quoting *Thomas v. Rev. Bd. of the Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981)).  Whether the government has "substantially burden[ed] a person's exercise of religion" often depends on whether the person has done something to "exercise" their beliefs in the first place.  *See Sabir*, 52 F.4th at 59 ("The term 'exercise of religion' extends beyond 'belief and profession' and encompasses 'the performance of . . . physical acts [such as] assembling with others for a worship service.'") (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005)).

Here, the Court need not move beyond step one.  As outlined above, to state a claim, plaintiffs must plausibly allege some actual "burden" on their religious beliefs and/or practices.  *See Jolly*, 76 F.3d at 477; *Sabir*, 52 F.4th at 59.  But in this respect, the complaint falls short.

As defendants highlight, plaintiffs do not claim that defendants' denials of M.L.A.A.'s, Noor's, and Erjuwan's I-130 petitions, based on evidentiary issues, burdened their ability to exercise their faith.  Dkt. No. 13 at 22.  The closest plaintiffs come is by asserting that defendants have "impos[ed] Western standards on the meaning of adoption."  Compl. ¶ 102.  But even if the Court credits this claim, it does not describe an attempt by defendants to pressure anyone to change any beliefs or behaviors, so it does not state a substantial burden on religious exercise.  *See Jolly*, 76 F.3d at 477; *see also Kaemmerling v. Lappin*, 553 F.3d 669, 680 (D.C. Cir. 2008)

(holding that "seek[ing] to require the government itself to conduct its affairs in conformance with [plaintiff's] religion" was not a substantial burden under RFRA) (emphasis omitted)).

Since plaintiffs have failed to plausibly allege a substantial burden on their religious exercise, they have failed to state a RFRA claim, and Count Three must be dismissed.

### D.    This Case Does Not Warrant Declaratory Relief

Finally, plaintiffs separately seek relief under the Declaratory Judgment Act.  Compl. ¶¶ 167–171.  Defendants respond that plaintiffs have essentially repackaged their substantive claims into a plea for declaratory relief, thus precluding the latter.  *See* Dkt. No. 19 at 3 (noting language in pleading that "mirror[s] APA language").

Under Second Circuit precedent, district courts consider the following factors in deciding whether to grant a claim for a declaratory judgment:

> (1) whether the declaratory judgment sought will serve a useful purpose in clarifying or settling the legal issues involved; (2) whether such a judgment would finalize the controversy and offer relief from uncertainty; (3) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata; (4) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; (5) whether there is a better or more effective remedy; and (6) whether concerns for 'judicial efficiency' and 'judicial economy' favor declining to exercise jurisdiction.

*Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 99–100 (2d Cir. 2003) (cleaned up). In the same case, the panel recognized district courts' "'broad . . . discretion' to decline jurisdiction under the [Declaratory Judgment Act]."  *Id.* at 100.

Notably, "[c]ourts generally reject a declaratory judgment claim as duplicative when other claims in the suit will resolve the same issues." *Hahn v. JetBlue Airways Corp.*, 738 F. Supp. 3d 229, 253 (E.D.N.Y. 2024) (collecting cases).

Such is the case here.  Plaintiffs' prayer for declaratory relief largely echoes their substantive counts, albeit in an abbreviated fashion.  Compl. ¶¶ 169–170 (seeking "a declaration finding Defendants' actions . . . are . . . discriminatory and contrary to law," since "Defendants have severally and jointly violated federal regulations and Plaintiffs' due process rights").

For the reasons detailed above, the Court must dismiss plaintiffs' substantive claims at this stage.  Accordingly, plaintiffs' request for a declaratory judgment must also be denied.

## V.      CONCLUSION

Plaintiffs put forward a series of conclusory, irrelevant, or otherwise legally insufficient claims that fail to plausibly allege violations of the APA, the Fifth Amendment, or RFRA. Because none of plaintiffs' allegations adequately states a claim for relief, Counts One through Three and plaintiffs' request for declaratory relief must be dismissed.

Therefore, it is

ORDERED that

1.  Defendants' motion to dismiss (Dkt. No. 13) is GRANTED; and

2.  Plaintiffs' complaint is DISMISSED.

The Clerk of the Court is directed to terminate the pending motion, enter a judgment accordingly, and close the file.

**IT IS SO ORDERED.**

Dated:  August 4 2025
          Utica, New York.

Anthony J. Brindisi
U.S. District Judge